ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1139

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CONCERNED HOUSEHOLD ELECTRICITY CONSUMERS COUNCIL,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

_____

On Consolidated Petitions for Review of Environmental Protection Agency
Final Order

_____

Consolidated with Case No. 22-1140

_____

FINAL REPLY BRIEF OF PETITIONERS

_____

Harry W. MacDougald
Caldwell, Carlson, Elliott &
DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia  30346
(404) 843-1956
hmacdougald@ccedlaw.com

Francis Menton
Law Office of Francis Menton
85 Broad Street, 18th floor
New York, New York 10004
(212) 627-1796
fmenton@manhattancontrarian.com

*Attorneys for Petitioners in Case No. 22-1139 and 22-1140*

February 21, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY .......................................................................................... vii

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................ 3

    I.    EPA was Required to Consider the Merits of the Petitions. ................ 3

        A.    Petitioners Have Standing. ........................................................ 3

        B.    The Petitions Cited New Information and Were Timely. .......... 8

    II.    EPA Failed to Consider the Substance of the Petitions and
        Failed to Offer a Rational Explanation for its Decision ..................... 12

        A.    EPA Failed to Address Either The Lack of Temperature
                Data for over 40% of the Earth's Surface for 81% of the
                Instrumental Record Since 1900 or its Implications for
                Attribution. ............................................................................ 12

        B.    EPA Failed to Address the Significance of the Invalidity
                of Climate Models for Attribution. ........................................ 14

        C.    EPA Failed to Address Petitioners' Evidence Showing
                there Is no Increase in Frequency or Severity of Extreme
                Events. ................................................................................... 19

        D.    EPA Offers Non-sequiturs Rather than Substantive
                Analysis in Support of its Decision. ....................................... 20

        E.    Argument from Authority and Consensus are Not A
                Sufficient Response to Contrary Empirical Evidence ............. 25

        F.    EPA Failed to Address the Fundamental Challenge to the
                 Validity of Its Attribution Analysis. ...................................... 26

    III.    The "Extreme Deference" Standard of Review is Too Lax for
         Highly Consequential Scientific Findings that are the
         Foundation for Vast Increases in Regulatory Authority. ................... 27

i

IV.    *Massachusetts v. EPA* Should be Reevaluated in Light of *West Virginia v. EPA* ..................................................................................... 29

CONCLUSION .......................................................................................... 29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND TYPEFACE LIMITATIONS ....................................................................... 31

CERTIFICATE OF SERVICE ................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*American Electric Power v. Connecticut*, 564 U.S. 410 (2011)................................8

*Ciba-Geigy Corp. v. EPA*, 46 F.3d 1208 (D.C. Cir. 1995)......................................11

*Coal. for Responsible Regul., Inc. v. E.P.A.*, 684 F.3d 102 (D.C. Cir. 2012),
   *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A.*, 573
   U.S. 302, (2014), and *amended sub nom. Coal. for Responsible Regul.,
   Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015) .......................... 3, 14

*Electronic Privacy Information Center v. Presidential Advisory
   Commission on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017)......................7

*Group Against Smog & Pollution, Inc. v. EPA*, 665 F.2d 1284 (D.C. Cir.
   1981) ...............................................................................................................12

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989)......................................2

*Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996) ..........7

*Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088 (D.C.
   Cir.1988) ..........................................................................................................12

*Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975) . 10, 11

*PPG Indus., Inc. v. Costle*, 659 F.2d 1239 (D.C. Cir. 1981)...................................11

*S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947)......................................................20

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014).............................. 6, 28

## Statutes

42 U.S.C. § 7602(g) ...............................................................................................29

42 U.S.C. § 7607(d)(7)(B) ................................................................................ 10, 11

42 U.S.C. 7607(b)(1)..............................................................................................12

44 U.S.C. § 3516, note.............................................................................................7

5 U.S.C. § 553(e) ...................................................................................................11

*Authorities upon which we chiefly rely are marked with asterisks.*

**Other Authorities**

E. Meazell, *Super Deference, The Science Obsession, and Judicial Review as Translation of Agency Science*, 109 MICHIGAN L. REV. 733 (2011) ...............27

H.R. Rep. 95-294 (May 12, 1977) ........................................................................10

L. Nelson, *Delineating Deference to Agency Science: Doctrine or Political Ideology?*, 40 ENVIRONMENTAL LAW 1057 (2010) ............................................27

**Treatises**

CLEAN AIR ACT HANDBOOK, p. xxi (J. Domike & A. Zacaroli eds., 3d ed. 2011) ..............................................................................................................28

**Regulations**

Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) ....................... vii, 1, 2, 14, 18, 19, 20, 25, 26, 29

Final Rule, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ................................ vii, 1, 2, 5, 17, 19, 20, 26, 28, 29

Response to Comments on 2009 Endangerment Finding Vol., 7 .............................9

Response to the Petitions to Reconsider the Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act, Volume 1: Climate Science and Data Issues Raised by Petitioners (2010) .................................................................................................14

Technical Support Document for Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Dec. 7, 2009) ..................................................................... vii, 18, 19

**Other References**

*Addendum to the Research Report entitled: On the Validity of NOAA, NASA and Hadley CRU Global Average Surface Temperature Data & The Validity of EPA's CO2 Endangerment Finding, Abridged Research Report* (2019) ......................................................................................................13

*Biden climate advisor boasts '100 rules this year alone on appliances' & urges 'sustainable airlines'* CLIMATE DEPOT, https://www.climatedepot.com/2022/05/05/biden-climate-advisor-boasts-

100-rules-this-year-alone-on-appliances-sustainable-airlines-warns-industry-better-be-all-in-or-theyre-gonna-be-out-of-here/ .....................................7

Climate Change Regulatory Actions and Initiatives, U.S. Environmental Protection Agency, (https://www.epa.gov/climate-change/climate-change-regulatory-actions-and-initiatives .........................................................6

Feynman, Cornell Lecture, available at https://www.youtube.com/watch?v=b240PGCMwV0.........................................25

Fifth Supplement to CHECC's Petition for Reconsideration..................................19

FLASHBACK: Obama Promised Electricity Costs Would Skyrocket, WASHINGTON FREE BEACON (Jun. 2, 2014) available at https://freebeacon.com/issues/flashback-obama-promised-electricity-costs-would-skyrocket/ ........................................................................................4

Intergovernmental Panel on Climate Change, Sixth Assessment Report, Working Group 1, Chapter 3, § 3.3.1.2.1 ..........................................................17

J. Christy, R. Spencer W. Braswell, R. Junod, *Examination of space-based bulk atmospheric temperatures used in climate research*, Int'l Journal of Remote Sensing, VOL. 39, NO. 11, 3580–3607 (May 8, 2016), available at https://www.tandfonline.com/doi/full/10.1080/01431161.2018.1444293 ..........17

J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report* (2016) available at https://thsresearch.files.wordpress.com/2016/09/ef-cpp-sc-2016-data-ths-paper-ex-sum-090516v2.pdf.............................................................. 15, 21, 22, 24

J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report, Second Edition* (April 2017) available at https://thsresearch.files.wordpress.com/2017/04/ef-data-research-report-second-editionfinal041717-1.pdf.............................................................. 15, 21, 24

J. Wallace, J. D'Aleo & C. Idso, *Comment on "Examination of space-based bulk atmospheric temperatures used in climate research" by John R. Christy et al.* (2018) available at https://thsresearch.files.wordpress.com/2018/03/ef-data-comment-on-christy-et-al-paper-final-042818v4.pdf............................................................. 18, 24

Seventh Supplement to CHECC's Petition for Reconsideration of 2009 Endangerment Finding............................................................................ 13, 18, 23

*The United Kingdom's pioneering Climate Change Act*, OECD, (Oct. 6, 2021) https://www.oecd.org/climate-action/ipac/practices/the-united-kingdom-s-pioneering-climate-change-act-c08c3d7a/ ...........................................5

U.S. Climate Change Science Program Synthesis and Assessment Product 1.1, Temperature Trends in the Lower Atmosphere - Understanding and Reconciling Differences, Chapter 1, § 1.1, The Thermal Structure of the Atmosphere ......................................................................................................16

U.S. House Committee on Science, Space & Technology. March 29, 2017, Testimony of John R. Christy, available at https://science.house.gov/imo/media/doc/Christy%20Testimony_1.pdf?1 . 17, 18, 23

W. van Wijngaarden and W. Happer, *Dependence of Earth's Thermal Radiation on Five Most Abundant Greenhouse Gases* (June 8, 2020) available at https://arxiv.org/pdf/2006.03098.pdf ................................................23

W. van Wijngaarden and W. Happer, *Methane and Climate*, by, available at https://co2coalition.org/wp-content/uploads/2021/08/Methane-and-Climate.pdf.................................................................................................23

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| Agency | U.S. Environmental Protection Agency |
| $CH_4$ | Methane |
| CHECC | Concerned Household Electricity Consumers Council |
| $CO_2$ | Carbon Dioxide |
| Denial | Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) |
| Endangerment Finding | Final Rule, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) |
| EPA | U.S. Environmental Protection Agency |
| GHG | Greenhouse Gases |
| IPCC | Intergovernmental Panel on Climate Change |
| NOAA | National Oceanic and Atmospheric Administration |
| NASA | National Aeronautics and Space Administration |
| Technical Support Document | Technical Support Document for Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Dec. 7, 2009) |

## SUMMARY OF ARGUMENT

Petitioners have standing because of the effect of Greenhouse Gas regulation on energy and electricity prices. The Petitions were timely and assert novel evidence and argument.

EPA's Denial did not credibly address the merits of the following substantive points made in the Petition and Supplements of the Concerned Household Electricity Consumers Council ("CHECC"), all of which are of central relevance to the validity of the 2009 Endangerment Finding for Greenhouse Gases (GHGs):

1. That there is virtually no temperature data for the Southern hemisphere oceans prior to the year 2000, i.e., virtually no data for over 40% of the globe for 100 of the 123 years—81%—of the 1900-2022 surface temperature record. Thus, the data used in its place was necessarily made up, invalidating the temperature records line of evidence;

2. That the lack of temperature data for so much of the planet for so much of the instrumental record precludes development of a validated physical understanding of climate;

3. That the lack of temperature data and the lack of a validated physical understanding of climate preclude development of validated climate models;

1

4. That the petitions invalidate climate models on multiple independent grounds;

5. That model invalidity precludes their use in attribution analysis;

6. That the Endangerment Finding's claims of more frequent and severe extreme events were invalidated by credible empirical evidence;

7. That a pure physics analysis shows that doubling the concentrations of $CO_2$, Methane, Nitrous Oxide, and hydrofluorocarbons would have only a trivial impact on temperatures.

EPA's Denial did not grapple with the substance of any of these points.. EPA even criticized the CHECC submissions for failing to discuss topics they in fact discussed in detail.

EPA's failure to address the substance of the Petitions was arbitrary and capricious and did not consider the relevant factors and warrants remand of the Denial. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376–78 (1989).

The extreme deference standard of review is too permissive for ultra-consequential decisions like the Endangerment Finding.

# ARGUMENT

## I.     EPA WAS REQUIRED TO CONSIDER THE MERITS OF THE PETITIONS.

### A.     PETITIONERS HAVE STANDING.

EPA first seeks to avoid the substance of the Petitions by contending the Petitioners lack standing.

Petitioners have standing because the 2009 Endangerment Finding compels regulations reducing GHG emissions, mainly $CO_2$, which increases the cost of everything that uses or is derived from fossil fuels, including at a minimum, electricity generation, transportation, agriculture, and chemicals. Limiting emissions by regulations flowing from the Endangerment Finding has a direct and immediate effects upon Petitioners as ubiquitous as the uses for fossil fuels. "Standing to challenge agency action exists where a petitioner can demonstrate an 'injury in fact' that is fairly traceable to the challenged action and is likely to be redressed by a favorable judicial decision." *Coal. for Responsible Regul., Inc. v. E.P.A*., 684 F.3d 102, 131 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A*., 573 U.S. 302, (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015). The Petitioners in *Coal. For Responsible. Regul*. had standing to challenge the original Endangerment Finding, and so do the Petitioners here.

The Biden Administration and EPA explicitly seek to decarbonize the economy. The Endangerment Finding is the *sine qua non* of these efforts. This will injure the Petitioners by increasing the cost of everything that depends on fossil fuels, including electricity. We know this because in every jurisdiction that has pursued decarbonization as climate policy, a rapid increase in the price of electricity has directly followed.

The Government responds by contending that Petitioners' showing is "based on unsupported allegations" and is "too generalized and unsubstantiated to establish a 'concrete,' 'particularized,' and 'actual or imminent' injury." (Government Brief at 18). President Obama explained the causal connection EPA claims is missing: "Under my plan . . . electricity rates would necessarily skyrocket," explaining with admirable brevity, "I'm capping greenhouse gases. Coal power plants, natural gas, whatever the industry was, they would have to retrofit their operations. That will cost money. They will pass that money on to consumers."[1]

The plan President Obama was discussing did not pass Congress, but functionally similar regulations intended to achieve the same goal have been

---

[1] See *FLASHBACK: Obama Promised Electricity Costs Would Skyrocket,* WASHINGTON FREE BEACON (Jun. 2, 2014) available at https://freebeacon.com/issues/flashback-obama-promised-electricity-costs-would-skyrocket/ (last visited Feb. 6, 2023).

promulgated or proposed as a result of the Endangerment Finding. They will cause the price of electricity to "necessarily skyrocket."

All Petitioners are consumers of electricity. Obviously, they have a direct and particularized interest in their electricity prices not skyrocketing. Petitioners showed multiple real-world examples in California and Germany in which reducing GHG emissions by replacing fossil fuel electricity generation with wind and solar power directly and inevitably caused substantially higher electricity prices. EPA dismisses this effect on prices as speculative, but it is inevitable and is observed everywhere decarbonization has been tried. Electricity prices in Los Angeles have gone from 18.4 cents per kWh in 2018 to 26.0 cents per kWh in 2022,[2] a 41.3% increase.

In 2021 the UK government resolved to cut emissions by 78% by 2035.[3] Most coal plants have been shuttered and fracking for natural gas has been banned. "The estimated average standard electricity bill increased by 59% or £450 to £1,219 in 2022…."[4]

---

[2] *Average Energy Prices, Los Angeles-Long Beach-Anaheim – December 2022*, BUREAU OF LABOR STATISTICS, https://www.bls.gov/regions/west/news-release/averageenergyprices_losangeles.htm (last visited Feb. 6, 2023).
[3] *The United Kingdom's pioneering Climate Change Act*, OECD, (Oct. 6, 2021) https://www.oecd.org/climate-action/ipac/practices/the-united-kingdom-s-pioneering-climate-change-act-c08c3d7a/(last visited Feb. 6, 2023).
[4] *Quarterly Energy Prices, UK July to September 2022 and estimates for 2022*, DEPARTMENT FOR BUSINESS, ENERGY & INDUSTRIAL STRATEGY, https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attach

It has always been obvious that regulating GHG emissions would cause electricity prices to "skyrocket." *See* Petitioners' Brief, pp. 32-33; CHECC's original Petition, pp. 5-8. [JA_]. These real-world experiences confirm it.

The government also asserts that Petitioners "do not identify any *specific* EPA regulations that caused their alleged organizational injuries, let alone show that the unspecified regulations were adopted based on or as a consequence of the 2009 Endangerment Finding." Government Brief at 18. But the Endangerment Finding *obligates* EPA to regulate GHG emissions where contemplated by the statutory context, and it has. *See generally*, *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014). The webpage *What EPA Is Doing About Climate Change*, says "EPA works … to reduce greenhouse gas emissions ***through regulatory initiatives*** …."[5] (Emphasis added). The sub-page *Climate Change Regulatory Actions and Initiatives,*[6] lists the Endangerment Finding, and more than a dozen other regulatory actions covering fossil fuel power plants, oil and gas production, transportation, and onerous reporting requirements. These are in addition to a

---

ment_data/file/1126144/quarterly-energy-prices-december-2022.pdf (last visited Feb. 6, 2023).

[5] *See* https://www.epa.gov/climate-change/what-epa-doing-about-climate-change (last visited Feb. 6, 2023).

[6] Available at https://www.epa.gov/climate-change/climate-change-regulatory-actions-and-initiatives (last visited Feb. 6, 2023)

tsunami of climate regulations from other agencies.[7] There is no room to list them all.  But they are rooted, directly or indirectly, in the 2009 Endangerment Finding.

In addition to the foregoing, which equally affects Petitioner FAIR Energy Foundation ("FAIR"), FAIR has also suffered an informational injury from the Endangerment Finding and the Denial being based on scientific misinformation, and leading to regulations that impair its interests. Congress aimed to prevent regulatory decisions based on misinformation and logical fallacies by requiring rational decision making, standards of information quality, 44 U.S.C. § 3516, note, and providing for judicial review of endangerment findings. *Cf. Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341-342 (2016). The policies downstream of the misinformation-driven Endangerment Finding and Denial harm FAIR's organizational purposes of promoting cheap energy, economic growth and human flourishing, and educating policymakers on these topics. FAIR is entitled to a reasoned judgment on its Petition, but EPA's Denial fell far short of the mark.

---

[7] On April 29, 2022, Former White House Climate Advisor Gina McCarthy declared "We're actually going to do 100 rules this year alone on appliances …." *See Biden climate advisor boasts '100 rules this year alone on appliances' & urges 'sustainable airlines'* CLIMATE DEPOT, https://www.climatedepot.com/2022/05/05/biden-climate-advisor-boasts-100-rules-this-year-alone-on-appliances-sustainable-airlines-warns-industry-better-be-all-in-or-theyre-gonna-be-out-of-here/ (last visited Feb. 7, 2023).

Petitioners' injuries are redressable by vacatur of the Denial and an honest reassessment of the Endangerment Finding because it would lead to elimination of emissions limitations, and the consequent increased costs for transportation, electricity and other goods and services derived from fossil fuels.

Lastly, the those seeking less GHG regulation should be treated equally as those seeking more. How warming that is ***global*** could meet the *particularized* injury requirement is hard to understand. How that injury could meet the redressability requirement through emissions reductions whose effect on temperatures, if any, would be below the threshold of detection in global average temperature is equally baffling. But standing for such claims was found in *Massachusetts v. EPA,* 549 U.S. (2007) and *American Electric Power v. Connecticut*, 564 U.S. 410 (2011). By that standard these Petitioners also have standing.

B.    THE PETITIONS CITED NEW INFORMATION AND WERE TIMELY.

EPA also contends it was not required to consider the merits of the Petitions because they presented nothing new, and that if there was anything new, it was presented too late. The first argument is factually incorrect and the second is legally incorrect.

To claim there is "nothing new," EPA analogizes—at the highest possible level of generality—between the arguments of Petitioners and arguments rejected

8

by EPA in Endangerment Finding proceedings in 2009 and 2010. Of course, all of the Wallace et al. papers and the other papers cited in the CHECC Petition were written in 2016 or later, well after the Endangerment Finding, and include data compiled after 2009. The Wallace, et al. papers presented methods of econometric and structural analysis not discussed in any of the Endangerment Finding documents. In the entire set of those documents (including the 2010 petitions for reconsideration), totaling 1,749 pages, the word "econometric" appears only one time, in Response to Comments Vol., 7, Response 7-5, p. 3, discussing a paper projecting flood loss damages. There are *zero* instances in these documents of multiple key concepts of the econometric analysis of time series data used in the Wallace papers, including the following:

"Structural analysis;"

"Time series decomposition"

"Simultaneity" or "simultaneous equation;"

"Collinear," "multicollinear" or any of their cognates;

"Multivariate ENSO Index," "MEI," "cumulative MEI;"

"Cumulative TSI."

EPA's contention that the analyses in the Wallace et al. papers were previously considered is simply incorrect.

EPA next argues that anything that is new was presented too late. This argument cannot be squared with *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975) and its progeny. Under that decision, which was confirmed in the 1977 amendments to the Clean Air Act and in subsequent decisions of this Court,[8] there is a three-step process for handling petitions like the ones at issue:

> (1) The person seeking revision of a standard of performance, or any other standard reviewable under Section 307, should petition EPA to revise the standard in question. The petition should be submitted together with supporting materials, or references to supporting materials. (2) EPA should respond to the petition and, if it denies the petition, set forth its reasons. (3) If the petition is denied, the petitioner may seek review of the denial in this court pursuant to Section 307.

*Id*. at 666. Petitioners took step one. EPA took Step Two by responding to the petitions and explaining its decision, albeit inadequately. Now, Petitioners have taken Step Three in appealing the denial of their petitions.

EPA contends that under the statute, 42 U.S.C. § 7607(d)(7)(B), it has no duty to respond to material that came to light more than 60 days after the underlying agency decision. However, the Court in *Oljato* recognized that "Congress sought in Section 307 to provide a legal mechanism and an exclusive one to assure that standards were revised whenever necessary." *Id*. at 660.

---

[8] "[T]he committee bill confirms the court's decision in *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975)." *See* H.R. Rep. 95-294, at 323 (May 12, 1977).

10

> [I]t would not be in the public interest to measure for all time the
> adequacy of a promulgation of any standard or regulation by the
> information available at the time of such promulgation. In the area of
> protection of public health and environmental quality, it is clear that new
> information will be developed and that such information may dictate a
> revision or modification of any promulgated standard or regulation
> established under the act. The judicial review section, therefore, provides
> that any person may challenge any promulgated implementation plan
> after the date of promulgation whenever it is alleged that significant new
> information has become available.

*Oljato*, 515 F.2d at 660 (quoting S.Rep.No.91-1196, 91st Cong., 2d Sess., 41-42

(1970)).

In *Oljato* itself the petition was remanded to EPA for consideration on its

merits even though it was filed long outside the 60-day period EPA would rely

upon to bar Petitioners here. *PPG Indus., Inc. v. Costle*, 659 F.2d 1239, 1250 (D.C.

Cir. 1981) held that amendment or repeal of a Clean Air Act regulation could be

sought under 5 U.S.C. § 553(e) *or* 42 U.S.C. § 7607(d)(7)(B) even well outside the

60-day review window:

> Alternatively, a petition may be filed directly with EPA to interpret or
> amend the standard, to withdraw the Guidelines, or to specify midnight
> to midnight reporting procedures. *See* 42 U.S.C. § 7607(d)(7)(B); 5
> U.S.C. § 553(e). Either route would provide a reviewing court with a
> contemporaneous record of the agency's consideration of this issue,
> rather than with the "post hoc rationalizations of counsel."

*PPG Indus., Inc. v. Costle*, 659 F.2d at 1250, *citing Oljato*, 515 F.2d at 665-68.

In *Ciba-Geigy Corp. v. EPA*, 46 F.3d 1208, 1210 (D.C. Cir. 1995) the Court

extended the rationale to a different environmental statute, noting it had

"subsequently endorsed the same procedure [as in *Ojlato*], also under section 307, in *Group Against Smog & Pollution, Inc. v. EPA*, 665 F.2d 1284, 1290 (D.C. Cir. 1981); and *Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088 (D.C. Cir.1988)." In *Group Against Smog*, the Court treated the petition according to its substance and found it timely: "We find the instant challenge is in effect a petition to revise and broaden a preexisting … standard on the basis of new information, and as such is not untimely." 665 F.2d at 1286. The statute and these cases allow petitions based on "grounds arising after," 42 U.S.C. 7607(b)(1), and the petitions in this case are timely under that rule. *Oljato*, 515 F.2d at 667 ("we shall look with disfavor upon undue semantic reliance" on preliminary jurisdictional requirements to avoid the merits of "grounds arising after" petitions). Thus, EPA cannot evade considering the substance of the Petitions on any ground asserted, and in fact chose to do so, albeit inadequately as will be shown below.

## II.    EPA FAILED TO CONSIDER THE SUBSTANCE OF THE PETITIONS AND FAILED TO OFFER A RATIONAL EXPLANATION FOR ITS DECISION.

There are multiple substantive points in the Petitions that EPA either never addressed or that were not addressed reasonably or rationally.

### A.    EPA FAILED TO ADDRESS EITHER THE LACK OF TEMPERATURE DATA FOR OVER 40% OF THE EARTH'S

12

SURFACE FOR 81% OF THE INSTRUMENTAL RECORD SINCE 1900 OR ITS IMPLICATIONS FOR ATTRIBUTION.

There is virtually no data for the Southern Hemisphere oceans, which are over 40% of the earth's surface, before 2000. *See* Seventh Supplement, p. 5. [JA-241].[9] Thus, in the instrumental record from 1900-2022, for 100 of 123 years, or 81% of the instrumental record over this period, there is virtually no data for over 40% of the surface of the earth.

This makes it *mathematically impossible* to develop a credible global average surface temperature record going back to 1900. *See* CHECC Seventh Supplement, pp. 4-5 [JA-240-241]. This brute and stubborn fact has profound implications for all three lines of evidence on which attribution is based. It means (1) the temperature records are invalid; (2) without valid temperature data no validated physical understanding of climate can be developed; and (3) without valid temperature data and a validated physical understanding of climate, climate model validation is impossible.

EPA responds by repeating conclusions from consensus and authority without ever grappling directly with this lack of data or how attribution could still be correct when the lines of evidence on which it is based are so fatally flawed.

---

[9] Citing *Addendum to the Research Report entitled: On the Validity of NOAA, NASA and Hadley CRU Global Average Surface Temperature Data & The Validity of EPA's CO2 Endangerment Finding, Abridged Research Report* (2019). [JA-241].

To avoid the substance, EPA says the argument presents nothing new, and that it previously rejected similar arguments, and that the D.C. Circuit affirmed in *Coal. for Responsible Regul., Inc. v. E.P.A,* 684 F.3d 102 (D.C. Cir. 2012). But EPA has not shown where in the Endangerment Finding documents the lack of data from the Southern hemisphere oceans was addressed. In fact, the 2010 Response to the Petitions for Reconsideration states "We note that the petitioners have raised no objections concerning the sea surface temperature record, despite the fact that the oceans cover about 70% of the Earth's surface, and therefore, ocean surface temperature trends are the dominant component of any global temperature trend analyses."[10] EPA could not rationally reject the importance of the lack of this data because it is deeply irrational to claim a valid global average surface temperature record when there is virtually no monthly data for over 40% of the planet for 81% of the 123 year record from 1900-2022.

B.    EPA Failed to Address the Significance of the Invalidity of Climate Models for Attribution.

Petitioners showed that climate models—the third line of evidence for attribution—were invalidated on multiple independent grounds.

---

[10] EPA's Response to the Petitions to Reconsider the Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act, Volume 1: Climate Science and Data Issues Raised by Petitioners (2010), p. 62 [JA-168].

EPA responded, but only generally, to the multi-faceted refutation of the Tropical Hot Spot of both Wallace 2016[11] and 2017a[12] and the other materials referenced in the CHECC Petition and supplements. But in important respects EPA did not respond at all to Wallace 2017a, which is by far the most important of the Wallace papers.

EPA's response is to claim that Petitioners misrepresented the importance of the Tropical Hot Spot. They point to Petitioners' use of the words "unequivocally" and "integral" to describe the importance of the Tropical Hot Spot to the physical understanding and modeling of climate. EPA argues this is a misrepresentation because the word "unequivocally" does not appear in Intergovernmental Panel on Climate Change ("IPCC") Fourth Assessment Report Chapter 9, while the word "integral" appears only once, in a different context. That is quite true, but EPA attacks a straw man. Petitioners did not quote these words from the IPCC report. Instead, they were Petitioners' choice of words to *accurately* characterize of the material that *was* quoted. The relevant text and figures from the assessment literature were quoted at pp. 21-23 of Petitioners' brief with pinpoint cites and

---

[11] J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report* (2016) [JA-326].
[12] J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report, Second Edition* (April 2017) [JA-395].

hyperlinks. [JA-521; JA-573-574]. Petitioners fairly described their meaning and significance. It was the IPCC, not Petitioners, that said "[t]he major features shown in Figure 9.1 *are robust to using different climate models*."[13] In this Figure 9.1 (at p. 23 of Petitioners' brief) the Tropical Hot Spot is self-evidently such a "major feature"—the red blobs in the middle of panels (c) and (f). Since it is a "major feature" that is "robust to using different climate models," the Tropical Hot Spot is unequivocally an integral element of their physical understanding and modeling of climate.

Similarly, it was not Petitioners but the U.S. Climate Change Science Program, Synthesis and Assessment Product 1.1, Temperature Trends in the Lower Atmosphere - Understanding and Reconciling Differences, Chapter 1, § 1.1, The Thermal Structure of the Atmosphere, p. 19 [JA-520], that explicitly said

> The presence of such greenhouse gases (e.g., carbon dioxide, methane, nitrous oxide, halocarbons) increases the radiative heating of the surface and troposphere. … In general, the lapse rate can be expected to decrease with warming **such that temperature changes aloft exceed those at the surface.**

(Emphasis added). This text plainly states that temperature changes aloft exceed those at the surface *because of increasing greenhouse gases*. This is the Tropical Hot Spot in words and was quoted verbatim on p. 21 of Petitioners' brief and at p.

---

[13] Petitioners' Brief, pp. 23; *see* also Intergovernmental Panel on Climate Change, Fourth Assessment Report, Working Group 1, Chapter 9, Figure 9.1 [JA-573].

10-11 of CHECC's original Petition for Reconsideration. [JA-190-191]. That report's visual depiction of the Tropical Hot Spot is reproduced on p. 22 of Petitioners' Brief. It closely resembles the IPCC version of the Hot Spot on p 23 of Petitioners' Brief, both showing a red blob—the Hot Spot itself—representing a higher rate of warming in the tropical upper troposphere than at the surface.

EPA relies in the Endangerment Finding and in the Denial at p. 22 [JA-24], and its brief at p. 49 on a 2009 analysis that found there was no model-observation discrepancy. Subsequent analyses invalidate that conclusion, and not just the Wallace papers. The IPCC's most recent comparison of models and observations finds "with medium confidence that … models continue to overestimate observed warming in the upper tropical troposphere … ."[14] In addition, charts from John Christy's Congressional testimony, at p. 25 of Petitioners' Brief, and p. 24 of the amicus brief of Happer, Lindzen and the CO2 Coalition ("Happer et al."), also show the significant model-observation mismatch. [JA-691, JA-695]. A statistically significant mismatch was also reported in Christy et al.'s, *Examination of space-based bulk atmospheric temperatures used in climate research*, INT'L JOURNAL OF REMOTE SENSING, VOL. 39, NO. 11, 3580–3607 (May 8, 2018).[15] This paper was

---

[14] Intergovernmental Panel on Climate Change, Sixth Assessment Report, Working Group 1, Chapter 3, § 3.3.1.2.1 [JA-624].
[15] [JA-700].

discussed in CHECC's Seventh Supplement at pp. 10-13 [JA246-249] and was the subject of a separate Wallace analysis,[16] also discussed in the Seventh Supplement.

EPA's contention at p. 48 of its brief, and p. 21 of the Denial [JA-23] that the model-observation mismatch on the Tropical Hot Spot is not important is inconsistent with its previous position on this topic. The Technical Support Document for the 2009 Endangerment Finding at p. 50 [JA-116] says that if the Hot Spot were missing it would be "an important inconsistency." Now that it is proven to be missing, *even by the IPCC*, EPA says it is an unimportant inconsistency. EPA's double-talk does not meet the requirement of rational decision making.

The IPCC's 6th Assessment Report, the Wallace papers, Christy's Congressional testimony and the Christy 2018 paper are all new analyses based on additional data collected since 2009 that invalidate by independent means and methods EPA's 2009 conclusion that there was no model-observation discrepancy. These findings are fatal to proving the validity of the theoretical understanding of climate and of climate models, without which attribution of global warming to rising GHG concentrations is not possible. This demands a thorough reevaluation

---

[16] *See* J. Wallace, J. D'Aleo & C. Idso, *Comment on "Examination of space-based bulk atmospheric temperatures used in climate research" by John R. Christy et al.* (2018) (Wallace 2018), [JA-498] (Cited in CHECC 7th Supplement, p. 10 [JA-246]).

of the attribution analysis. EPA has failed to engage the substance of the proof of the invalidity of the physical understanding and modeling and failed to provide a rational explanation for rejecting these findings from diverse sources which go to the very heart of attribution.

### C. EPA FAILED TO ADDRESS PETITIONERS' EVIDENCE SHOWING THERE IS NO INCREASE IN FREQUENCY OR SEVERITY OF EXTREME EVENTS.

In the 2009 Technical Support Document, EPA claimed human GHG emissions made six categories of extreme events more frequent and severe. [JA-102-104][17] The Fifth Supplement to CHECC's Petition showed by credible empirical data and top subject matter experts there was no increase in frequency or severity of any ten categories of extreme events, including those listed by EPA. [JA-214-228]. For sea level rise Petitioners showed there was no acceleration in the trend over the last 100 years according to credible tide gauge data from all over the world. [JA-223-224].

EPA's *entire* response was to say that Petitioners did "not connect these claims to language in the 2009 Endangerment Finding, or, indeed, in any of the scientific assessment literature that was cited in that finding." Denial, p. 28 [JA-30]. This was wildly untrue, as shown *in detail* in the Fifth Supplement [JA-213] and Petitioners' Brief pp. 43-46.

---

[17] *See* citations given at pp. 44-45 of Petitioners' opening brief.

The Denial offered no other response whatsoever, much less a substantive response.

EPA's brief repeats the clearly false claim that Petitioners did not connect their contentions on extreme events to anything in the Endangerment Finding or supporting literature. It then cites various other sources to buttress the claims about extreme events. These references were not set out in the Denial and are instead post hoc rationalizations in EPA's brief to make points not made in the Denial. "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. …" *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947). The Denial's failure to respond to the substance of Petitioners' arguments and evidence on extreme events was arbitrary and capricious.

D.    EPA OFFERS NON-SEQUITURS RATHER THAN SUBSTANTIVE ANALYSIS IN SUPPORT OF ITS DECISION.

*1.* EPA states that no single statistical technique can substitute for the three lines of evidence. Denial, p. 18 [JA-20]. This misses the point: the statistical analysis is not a substitute for the three lines of evidence; it instead tests their validity for use in attribution—a test each clearly fails. Nor do Petitioners rely on a "single" statistical test – there are many tests applied in the Wallace papers in a

clearly stated, consistent and mathematically correct manner, all yielding the same results.

*2.* EPA next contends that both Wallace 2016 and Wallace 2017a used the Cumulative Multivariate ENSO Index ("MEI") variable. This is simply incorrect as Cumulative MEI was not used in the 2017a paper. Compare Wallace 2016, pp. 21-23 [JA-346-348] and Wallace 2017a p. 18 [JA-412]. In Wallace 2017a, Cumulative Total Solar Irradiance (TSI) was used rather than Cumulative MEI. The 2016 paper illustrated that the Cumulative MEI reflected both solar and oceanic activity influences. Wallace 2016, pp. 15-20 [JA-340-345]. Wallace 2017a, which was ignored by EPA, measured the natural factor impacts separately.

*3*. EPA also contends that Wallace 2016 improperly used the MEI variable from 1950 forward instead of from the beginning of the time series, and that "there is no indication that the reports' authors even reviewed the earlier MEI dataset." In fact, Wallace 2016 devotes six pages to detailed analysis and comparison of Cumulative MEI and Cumulative TSI over the period 1900 to 2006. *See* Section VI at pp. 15-21 [JA-340-346]. In addition, the original Petition for Reconsideration filed January 20, 2017, at p. 9 [JA-189] provides a link to the data analyzed in

Wallace 2016.[18] That data includes a tab of MEI data going back to 1900 labeled "1900+ MEI."

That EPA was oblivious to Wallace 2016's detailed examination of historical MEI data and to the fact that Wallace 2017a does not use Cumulative MEI constitute a failure to rationally respond to the substance of the Petitions.

*4.* EPA's Decision, p. 19 [JA-21], and its brief, p. 44, criticize the econometric and structural analysis of the Wallace papers for failing to incorporate a physical understanding of the climate system. This *completely* misses the point. Both the 7th Supplement at pp. 12-13 and Petitioners' Brief at pp. 17-18 quote the explanation by Dr. John Christy in his Congressional testimony of how the statistical modeling approach ***does*** capture the aggregate of the physical processes of climate:

> The advantage of the simple statistical treatment [referring to Wallace (2016)] is that ***the complicated processes such as clouds, ocean-atmosphere interaction, aerosols, etc., are <u>implicitly incorporated by the statistical relationships discovered from the actual data</u>***. Climate models attempt to calculate these highly non-linear processes from imperfect parameterizations (estimates) ***whereas the statistical model directly accounts for them since the bulk atmospheric temperature is the response-variable these processes impact***. It is true that the statistical model does not know what each sub-process is or how each might interact with other processes. … I simply point out that because

---

[18] The link is https://thsresearch.files.wordpress.com/2017/01/ef-cpp-sc-2016-data-ths-data-master-original.xlsx, (last visited Feb. 6, 2023).

the model is constrained by the ultimate response variable (bulk temperature), ***these highly complex processes are included***.[19]

(Emphasis added) [JA-696-697]. EPA never responded to this point. Since the Wallace papers are analyzing temperature data that by its nature represents the ultimate output of all the embedded physical processes of climate, both known and unknown, EPA's critique that the papers do not incorporate the physical processes of climate fails to meet the rational basis standard of review.

Moreover, it is simply false to say the Petitions ignored physics entirely. The Seventh Supplement at pp. 19-21 [JA-255-257] discussed a pure physics analysis by van Wijngaarden & Happer that the effects of doubling CO2 and other trace GHG concentrations would be trivial because the absorption of outbound infrared radiation is already almost entirely saturated at current concentrations.[20] The amicus brief of Happer, et al. at pp. 29-32 cites related underlying work.[21] This pure physics approach, which did not consider the effect of clouds, is not inconsistent with the statistical analysis of the Wallace papers showing that rising

---

[19] U.S. House Committee on Science, Space & Technology. March 29, 2017, Testimony of John R. Christy, pp. 10-11. ("Christy Testimony") [JA-687].

[20] The Seventh Supplement, pp. 19-21 [JA-255-257], cited to W. van Wijngaarden and W. Happer, *Methane and Climate*, by, available at https://co2coalition.org/wp-content/uploads/2021/08/Methane-and-Climate.pdf (last visited Feb. 6, 2023 (link changed from Seventh Supplement)).

[21]  W. van Wijngaarden and W. Happer, *Dependence of Earth's Thermal Radiation on Five Most Abundant Greenhouse Gases* (June 8, 2020) available at https://arxiv.org/pdf/2006.03098.pdf (last visited Feb. 6, 2023).

CO2 concentrations have had no statistically significant impact on temperatures. EPA totally overlooked the citation to the van Wijngaarden & Happer physics-based work and criticized a statistical model for not being a physical model.

   *5.* At p. 45 of its brief, EPA argues there is an inconsistency in the Wallace papers' treatment of changes in radiative forcing from volcanic ejecta and increasing CO2. This is another straw man and reflects another failure to analyze the substance of the Wallace papers, which make no a priori assumptions about whether CO2 has a statistically significant impact on temperature. Instead, they *test* this by removing the effect of natural factors which are inherently independent of CO2: volcanoes, solar and oceanic activity. As Wallace 2017a explains:

> Hence, to seek validation of EPA's claim that CO2 is a pollutant, two steps are taken. The first step removes the Natural Factor impacts on a Temperature time series. The second step then tests this Natural Factor Impact Adjusted Temperature time series for the possible impact of rising CO2 levels.

Wallace 2017a, p. 11 [JA-405]. This econometric testing is also explicitly carried out in Wallace 2016 and Wallace 2018. EPA's statement at p. 45 of its brief that the authors "do not even acknowledge the question [of the effect of rising GHGs on temperature], let alone try to answer it" reflects either ignorance or misrepresentation of the analyses actually carried out in these papers. The possibility that increasing CO2/GHG concentrations cause increasing temperatures is explicitly acknowledged and specifically tested. No CO2 or GHG impact was

found once natural factors were removed from the many temperature data sets analyzed. EPA's Denial rests at least in part on clear and substantial mischaracterizations of the Wallace papers and is therefore not a legally sufficient response to the Petitions.

E.    ARGUMENT FROM AUTHORITY AND CONSENSUS ARE NOT A SUFFICIENT RESPONSE TO CONTRARY EMPIRICAL EVIDENCE

EPA based its Denial on the assessment literature, particularly the Intergovernmental Panel on Climate Change ("IPCC") reports, and on its Summary for Policy Makers. However, as demonstrated at pp. 19-22 of the amicus brief of Happer et al., the IPCC Summary for Policy Makers is a political rather than scientific report. In the IPCC process, science is conformed to policy. In EPA's Denial, IPCC policy is presented as though it were science.

EPA's generalized reliance on these authorities is argument from a purported consensus and from authority, classical logical fallacies. This is not "scientific" and does not conform to the scientific method. As Feynman made plain, if the predictions of a theory do not match observations, the theory is wrong, and "***it doesn't matter how smart you are, or who made the guess, or what his name is— If it disagrees with experiment, it's WRONG. That's all there is to it***."[22] (Emphasis added). EPA takes the opposite approach, relying on IPCC authority,

_____

[22] Richard Feynman, Cornell Lecture, available at https://www.youtube.com/watch?v=b240PGCMwV0 (last visited Feb. 6, 2023).

while rejecting the significance of their invalid data and failed predictions. *See also* Happer et al. amicus brief, pp. 16-18. EPA has not met the requirement of rational decision making.

F. EPA Failed to Address the Fundamental Challenge to the Validity of Its Attribution Analysis.

In the Endangerment Finding, EPA explicitly based attribution on the three lines of evidence—physical understanding of climate, temperature records and climate modeling. 74 C.F.R page 66,518 [JA-66]. If the three lines of evidence are each invalid, then no conclusion flowing from them can be valid. This defect cannot be overcome by EPA's arm-waving argument from consensus and authority. Unscientific logical fallacies that do not address much less refute the underlying invalidity of the lines of evidence are not sufficient. As if to illustrate the point, EPA's brief at p. 55 claims that even if the three lines of evidence are invalid, the attribution analysis remains correct because EPA "'considered the entirety of the evidence regarding both historical and projected climate change, not just the three lines of evidence regarding attribution.'" (C*iting* Denial, p. 16 [JA-18]). But since "historical and projected climate change" *are* temperature records and modeling, EPA is saying that it considered not only temperature records and modeling, but also temperature records and modeling. The statutory standard of rational decision making requires something more than a word salad.

In sum, EPA's response to the substance of the Petitions is a bonfire of logical fallacies, mischaracterizations, prevarications, straw man attacks, obtuse misunderstandings, and non-sequiturs. It fails utterly to satisfy the permissive requirements of rational basis review.

### III.  THE "EXTREME DEFERENCE" STANDARD OF REVIEW IS TOO LAX FOR HIGHLY CONSEQUENTIAL SCIENTIFIC FINDINGS THAT ARE THE FOUNDATION FOR VAST INCREASES IN REGULATORY AUTHORITY.

The Court should decide whether the extreme deference standard of review is appropriate to a case of this nature. First, and regardless of the importance of the case, there is reason to doubt that "extreme deference" complies with the statutory standard requiring that decisions be rational and not arbitrary and capricious. There is obvious tension between affording "an extreme degree of deference" and "ensur[ing] EPA has examined the relevant data and has articulated an adequate explanation for its action." *City of Waukesha v. E.P.A.*, 320 F.3d 228, 247 (D.C. Cir. 2003). There is abundant law review commentary arguing that extreme deference is too permissive and promotes a "science charade." *See e.g.*, Meazell, in *Super Deference, The Science Obsession, and Judicial Review as Translation of Agency Science*, 109 MICHIGAN L. REV. 733 (2011) and L. Nelson, *Delineating Deference to Agency Science: Doctrine or Political Ideology?*, 40 ENVIRONMENTAL LAW 1057, 1067 (2010) (commenting on "some agencies' tendency to craft these policy

choices within the scientific discourse to both avoid public accountability and ensure less judicial scrutiny.") The poor analytical quality and incoherence of EPA's Denial is the fruit of excessive deference. The bar has been set too low, and EPA has sunk to the occasion.

EPA's GHG Endangerment Finding is the foundation for a vast expansion of regulatory authority over the full range of human activity due to the ubiquitous nature of $CO_2$ and other GHG emissions. It was the springboard for "the single largest expansion in the scope of the [Act] in its history." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 310 (2014), *citing* CLEAN AIR ACT HANDBOOK, p. xxi (J. Domike & A. Zacaroli eds., 3d ed. 2011), p. xxi.

EPA's claim of regulatory authority covers literally all human activity. But it rests on a very dubious scientific determination, which in turn rests upon a very dubious claim of statutory authority. In our system of government such vast claims of regulatory power cannot rest upon such brittle foundations. The heightened scrutiny of sweeping claims of regulatory authority required by separation of powers and constitutional concerns under the major questions doctrine, *West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022) similarly counsels greater judicial scrutiny where monumental policy choices are hiding in a scientific house of cards. EPA's illogical and often incoherent response to the Petitions is inadequate by any standard.

28

## IV. *Massachusetts v. EPA* Should be Reevaluated in Light of *West Virginia v. EPA*.

Petitioners recognize this Court lacks authority to hold that *Massachusetts v. EPA,* 549 U.S. (2007) is no longer good law. The issue has been sufficiently preserved. Petitioners will only reiterate that the holding of *Massachusetts*, that GHGs were "air pollutants" even though Congress had no thought of fixing the weather when it adopted the act-wide definition of "air pollutant" in 42 U.S.C. § 7602(g), simply cannot be squared with *West Virginia v. EPA*'s plain statement requirement for such a vast claim of regulatory authority. Two major EPA GHG regulations have already been overturned based on the major questions doctrine. It is time to return to the source of the trouble. It is for Congress, not EPA, to decide whether the full sweep of human activity is subject to EPA regulation in a futile and destructive quest to control the climate.

## CONCLUSION

For the foregoing reasons, the Denial of these Petitions for Reconsideration of the Endangerment Finding should be vacated and remanded for reasoned decision making that honestly addresses all of Petitioners' empirical data and arguments.

Respectfully submitted,

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

29

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

/s/ Francis Menton
Francis Menton
Law Office of Francis Menton
85 Broad Street, 18th floor
New York, New York 10004
(212) 627-1796
fmenton@manhattancontrarian.com

Attorneys for Concerned Household
    Electricity Consumers Council and its
members *and*

FAIR Energy Foundation

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND TYPEFACE LIMITATIONS

I HEREBY CERTIFY THAT that the foregoing **Reply Brief of Petitioners**

complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(C). As

determined by the Microsoft Word software used to produce this brief, it contains

6,469 words, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that this document is prepared using the Times New Roman

font in the 14-point size.

Dated: February 21, 2023

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

*Counsel for Petitioners*

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing REPLY BRIEF OF PETITIONERS was filed electronically with the Court by using the CM/ECF system on this 21st day of February, 2023. Counsel for the Respondent and Respondent's Intervenors are registered CM/ECF users and will be served by the appellate CM/ECF system. In addition, service by email will be made upon the following Counsel for the Respondent and Respondent's Intervenors at the email addresses indicated below.

February 21, 2023.

Brian Lynk
U.S. Department of Justice
Energy and Natural Resources Division
brian.lynk@usdoj.gov

Sean Donahue
Donahue & Goldberg, LLP
sean@donahuegoldberg.com

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

*Counsel for Petitioners*

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com